IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM FRAZIER | * | |
| v. | * | Civil No. JFM-10-843 |
| DEPARTMENT OF JUVENILE SERVICES | * | |

******

## MEMORANDUM

Plaintiff William Frazier ("Plaintiff"), has filed suit against defendant Department of Juvenile Services ("Defendant" or "DJS") alleging racially discriminatory employment practices and unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.*, and Title 20 of the State Government Article of the Annotated Code of Maryland, Md. Code Ann., State Gov't §§ 20-601, *et seq.* Now pending before the court is Defendant's Motion for Summary Judgment. For the reasons that follow, Defendant's motion will be granted.

I.     FACTS

The following facts are uncontroverted or set forth in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Plaintiff, who is African-American, began employment with Defendant on December 26, 1996, first as a Youth Supervisor, and later as a Resident Adviser II. (Pl.'s Opp'n, Ex. 23, Frazier Dep. 36, Oct. 13, 2010.) At most times relevant to this proceeding, Plaintiff was assigned to the Savage Mountain Youth Center ("SMYC") in Lonaconing, Maryland, which provides residential services to youth in Defendant's care. (*Id.* at 36-37.) SMYC is operated by defendant DJS, which is an agency of the State of Maryland.

Plaintiff alleges that during his time as a DJS employee, he was subjected to a pattern of racially motivated discrimination. According to Plaintiff, this discrimination has taken the form of unfair disciplinary actions, the denial of promotions, and racially motivated remarks and insults from co-workers.[1] As for the disciplinary actions, Plaintiff recited in his deposition several examples of unfair disciplinary actions taken against him. (*See id.* at 44-67.) Although none of the actions involved a racial component on their face, Plaintiff maintains that he was "singled out" and disciplined "for no reason at all" because of his race. (*See id.* at 60, 55.) For example, Plaintiff testified about an incident in which he was disciplined for sleeping on the job. Although he admits that he "might've dozed," he asserts that he was singled out for discipline because of his race. (*Id.* at 44-50.) In another instance, Plaintiff states that he was issued a letter of reprimand for refusing the instruction of his shift supervisor to report to the medical clinic to assist with the transportation of youths. (*Id.* at 52-53; Def.'s Mem., Marr. Aff., Ex. E.) Plaintiff admits that he went home sick instead of reporting to the clinic as instructed, but he denies that this constituted legitimate grounds for discipline and asserts that "the whole thing was made up" because of his race. (Pl.'s Opp'n, Ex. 23, Frazier Dep. 53.) In addition to these and other incidents described in his deposition, Plaintiff testified that there may have been other instances in which Defendant disciplined him in a discriminatory fashion, but he states, "I've been wrote up so much I don't even know."[2] (*Id.* at 67.)

---

[1] Plaintiff also repeatedly asserts that, as a more general matter, he was "undermined," "disrespected," and "talked down to" by fellow DJS employees. (*See, e.g.*, Pl.'s Opp'n, Ex. 23, Frazier Dep. 105, 106, 124.)

[2] Indeed, Defendants have produced documentation of at least three additional occasions in which Plaintiff was issued a letter of reprimand during his term of employment. These instances are documented in exhibits attached to the affidavit of Kathryn Marr, DJS's Director of the Department of Human Resources. (Defs.' Mem, Marr Aff., Exs. C, D, & F.)

2

Plaintiff also alleges that on three occasions, Defendant denied him a promotion because of his race. In each instance, Plaintiff applied for a promotion from his current job as a Resident Adviser II to the position of Resident Adviser III. (*Id.* at 80-92.) The first of these denials occurred in April 2006 when Plaintiff applied for a promotion to Resident Adviser III, but David Green ("Green"), a Caucasian applicant, was chosen for the position instead. (*Id.* at 81-84.) Next, sometime between April 2006 and March 2008, Plaintiff again applied for a promotion to Resident Adviser III, but Defendant hired an outside applicant, who was Caucasian, from another DJS facility. (*Id.* at 85-87.) And finally, in March 2008, Plaintiff again applied for a promotion to Resident Adviser III, but Defendant instead promoted Timothy Shelton ("Shelton"), an African-American applicant, and Robert Fuller ("Fuller"), a Caucasian applicant. (*Id.* at 87-88.)

In addition to the disciplinary actions and denials of promotion, Plaintiff also alleges that he has been subjected to racially discriminatory comments made by co-workers at various times during his thirteen year career as a DJS employee. In his deposition testimony, Plaintiff recalled the following examples of racially discriminatory remarks:[3]

- On August 5, 2007, Ray Lehman ("Lehman"), a Caucasian DJS employee, stepped between Plaintiff and another African-American employee and stated, "Look, we've got an Oreo." (*Id.* at 116-18.)

- Sometime in 2007, Green responded to a youth's question about whether many African-Americans lived in Lonaconing by stating, "We don't have no Hispanics or no blacks up there." (*Id.* at 97-98)

- In August 2007, Green told Plaintiff to "kiss his white ass" in response to Plaintiff's request that Green assist him in the administration of medication to youth. (*Id.* at 92-94.)

---

[3] In addition to these verbal comments, Plaintiff also testified about an incident in which Lehman presented Plaintiff with a bag of parsley in front of youths and coworkers, pretending that the bag was marijuana. (Pl.'s Opp'n, Ex. 23, Frazier Dep. 119-23.) Plaintiff asserts that this "drug gag" was racially motivated.

3

- Sometime in 2008 or 2009, at a time when SMYC was offering a special lunch menu in conjunction with Black History Month, Mr. Sessea, a Caucasian employee, said to Plaintiff, "We're having, you know, what you like to eat, and don't get me wrong, I like it too." (*Id.* at 126-28.)

- Sometime during Plaintiff's employment, Mr. Harris, a Caucasian employee, made comments suggesting that Plaintiff should "get some black girls up here." (*Id.* at 130.)

- On September 28, 2007, at an off-site training class in which employees were handcuffed and shackled to demonstrate the use of manual restraints, Mr. Hayslip, a Caucasian employee from another DJS facility, made a remark to the effect of, "All we need now is a rope and a noose," when it was Plaintiff's turn to be shackled. (*Id.* at 99-102; Def.'s Mem., Phillips Aff. ¶ 5.)

Following the incident in which Green told Plaintiff to "kiss his white ass," Plaintiff filed an internal complaint with the DJS Office of Fair Practices ("OFP") in or around September 2007. A few weeks later, on October 22, 2007, a staff meeting was held in which a letter expressing concerns about Plaintiff was circulated and signed by fifteen of his coworkers, four of whom are African-American. (Pl.'s Opp'n, Ex. 23, Frazier Dep. 110-12; Ex. 3, OFP Position Statement 2.) The letter was drafted by Shelton, an African-American, and in it the employees alleged that Plaintiff "has a major 'racial' problem" and "has created a hostile work environment" at SMYC. (Def.'s Mem., Proctor Aff., Ex. A.) Specifically, the letter noted that "[s]taff are afraid to approach [Plaintiff] in fear that he may take what they say out of context and file a grievance." (*Id.*) The letter was delivered to Steven Northcraft, the Director of SMYC, and Northcraft forwarded the letter to OFP for investigation. (Def.'s Mem., Proctor Aff. ¶ 4.) OFP eventually determined that although "it is clear there are serious workplace issues at SMYC," the lack of documentation or administrative record concerning these issues prevented it from recommending any corrective measures against Plaintiff. (Pl.'s Opp'n, Ex. 3, OFP Position Statement 4-6.) Plaintiff denies the allegations contained in the letter and contends that the

4

reason the allegations had no documentary support is because they were fabricated in retaliation for his earlier OFP charge. (Pl.'s Opp'n, Ex. 23, Frazier Dep. 110, 115-16.)

On May 22, 2008, Plaintiff filed a charge of employment discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). (Pl.'s Opp'n, Ex. 6, EEOC Charge.) Specifically, the charge alleged "hostile work environment, racial harassment and intimidation," and Plaintiff checked boxes on the charge form indicating discrimination based on race and age. (*Id.*) Plaintiff did not check the box for discrimination based on retaliation. (*Id.*) On May 29, 2009, the EEOC issued a letter of determination concluding there was "reasonable cause to believe [Defendant] has violated Title VII" as to harassment, racial intimidation, and retaliation. (Pls.' Mem., Ex. 22, EEOC Determination Letter 1.) The conciliation process having failed, Plaintiff received a Notice of Right to Sue from the EEOC issued November 23, 2009. (Def.'s Mem., Ex. 2, Notice of Right to Sue.) On April 6, 2010, Defendant removed this case, originally filed in the Circuit Court of Allegany County, to federal court pursuant to 28 U.S.C. §§ 1441 and 1446. Plaintiff alleges employment discrimination consisting of discrete acts of disparate treatment, creation of a racially hostile work environment, and retaliation for engaging in protected activities, all actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* Defendant moves for summary judgment on each of these claims.

II. ANALYSIS

　　*A.　Standard of Review*

Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material

fact to resolve. *See Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). However, the nonmoving party "may not rest upon the mere allegations or denials of its pleadings, but rather must set forth specific facts" showing there is a genuine dispute about a material fact for trial. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003). A material fact is one that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a summary judgment motion, the court shall view the facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the nonmoving party. *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

## B. Exhibits Properly Before the Court

Prior to the merits of Defendant's motion, I must determine the admissibility of certain evidence offered in opposition to that motion. Plaintiff attached twenty-three exhibits to his memorandum opposing summary judgment. (Pl.'s Opp'n, Apr. 29, 2011, ECF No. 33.) I have already stricken fourteen of these documents from the record as untimely provided in the course of discovery. (Letter Order, June 29, 2011, ECF No. 39.)[4] Defendant now argues that most of Plaintiff's remaining exhibits would be inadmissible at trial and thus are not properly before the Court. (Def.'s Reply 2-7.)[5]

In deciding a motion for summary judgment, a court may only consider materials that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c); *see also Kennedy v. Joy Techs., Inc.*, 269 F. App'x 302, 308 (4th Cir. 2008) ("In assessing a summary judgment motion, a court is

---

[4] Stricken from the record were Exhibits 2, 4, 5, 7, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19. (Letter Order, June 29, 2011, ECF No. 39.)

[5] Defendant challenges as inadmissible Exhibits 1, 3, 8, 9, 20, 21, and 22. Defendant does not challenge Exhibits 6 and 23. (Def.'s Reply 2-7.)

entitled to consider only the evidence that would be admissible at trial."); *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669 (D. Md. 1999) ("To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)—that the documents be admissible in evidence."). Thus, "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993); *see also DeBlois v. Gensel*, No. CCB-07-2596, 2009 U.S. Dist. LEXIS 76027, at *6 (D. Md. Aug. 26, 2009) (documents considered on summary judgment must be "authenticated by either an affidavit or deposition"); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 536, 541-42 (D. Md. 2007) ("[U]nsworn, unauthenticated documents cannot be considered on a motion for summary judgment."). Similarly, a party may not rely on inadmissible hearsay, with the sole exception of affidavits or sworn declarations pursuant to Fed. R. Civ. P 56(c)(4). *See, e.g., Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 ("[S]everal circuits, including the Fourth Circuit, have stated that hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment.").

Plaintiff's Exhibits 8, 9, and 20 would not be admissible at trial and so cannot be considered on this motion. Exhibits 8 and 20 consist of private letters from Plaintiff to officials at the EEOC. Further, Exhibit 9 is a letter written by a physician stating an opinion on Plaintiff's mental health. Plaintiff has not attached these letters to an affidavit or declaration meeting the requirements of Fed. R. Civ. P. 56(c)(4), nor has he taken any other steps, such as those illustrated in Fed. R. Evid 901(b), to authenticate the letters. Therefore, these letters must be excluded. *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) ("[U]nsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").

Plaintiff's Exhbits 1 and 21 must also be struck because they would not be admissible at trial. Exhibit 1 consists of his September 6, 2007 complaint to OFP, and Exhibit 21 consists of an EEOC intake questionnaire dated September 22, 2009, presumably filed in pursuit of a second EEOC charge. As an initial matter, there is a serious question as to whether these exhibits constitute inadmissible hearsay. They are rife with out-of-court statements in which Plaintiff claims to have been discriminated against, and because Plaintiff is available to testify and was in fact deposed, these statements cannot be introduced to prove the existence of discrimination.[6] Yet I need not rest my decision to strike these exhibits on this basis because even if Exhibits 1 and 21 could be admitted under a hearsay exception, they would still be inadmissible for lack of authentication because they were not attached to a sworn affidavit or declaration. *See Smith v. Sentry Ins.*, 674 F. Supp. 1459, 1463 n.2 (N.D. Ga. 1987) (assuming that an EEOC intake questionnaire falls within the public records exception to hearsay, but holding that "[p]ublic records, though not subject to hearsay problems, should also be properly authenticated").

Exhibit 3 consists of OFP's determination regarding the complaint against plaintiff by fifteen of his coworkers. Although Plaintiff took no steps to authenticate the OFP determination, Defendant relied on the same document and authenticated it by attaching it to an affidavit of Charles Proctor, OFP's Acting Director. (*See* Def.'s Mem., Proctor Aff., Ex. B.) Several authorities hold that "when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity." *Orr v. Bank of*

---

[6] Further, to the extent Exhibit 1 is offered to prove the mere existence and date of the OFP complaint, Defendant has admitted those facts in its answer. (Ans. ¶¶ 15-16.) To the extent Exhibit 21 is offered as evidence of the scope of the original EEOC investigation, it is irrelevant to that purpose because it postdates the May 29, 2009 letter of determination that concluded the EEOC investigation.

8

*Am., NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002); *see also In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 285-86 (3d Cir. 1983), *rev'd on other grounds by Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); 31 Wright & Gold, Federal Practice & Procedure: Evidence § 7104 at 30-31 (2000) ("Once evidence offered against one party is deemed authentic, its authenticity is established as against all other parties as well."). I find the logic of these authorities persuasive, and as there is no binding authority to the contrary, I hold that since Exhibit 3 was authenticated by Defendant, it is also authenticated as to Plaintiff, meeting the requirements of Fed R. Evid. 901. Therefore, Exhibit 3 is properly before the Court and may be considered in my evaluation of this motion.

Exhibit 22 consists of the letter of determination issued by the EEOC in response to Plaintiffs' original EEOC charge. Although Exhibit 22 was not authenticated by extrinsic evidence, in some cases Fed. R. Evid. 901(b)(4) permits authentication based solely on "[a]ppearance, contents substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances." *See, e.g., Williams v. Long*, 585 F. Supp. 2d 679, 685 n.3 (D. Md. 2008) (holding that a document was authenticated under 901(b)(4) when it was signed by the two attorneys in a case and time-stamped by the Clerk's Office of the district court); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 928 & n.9 (3d Cir. 1986) (authentication of documents based on "company logos and other trademarks"); *Air Land Forwarders, Inc. v. United States*, 38 Fed. Cl. 547, 554 (1997) (authentication of document based on letterhead and accompanying signature). Exhibit 22 was signed by Gerald Kiel, Director of the EEOC's Baltimore Field Office, "on behalf of the Commission." It is written on Commission letterhead, bears its seal, and purports to address "Charge No: 846-2008-20025," which is the designation of Plaintiff's EEOC charge. (Pl.'s Opp'n, Determination Letter, Ex. 22.) Additionally, the letter

bears all of the distinctive characteristics of an EEOC determination letter and therefore could also be considered to be a copy of an official public report authenticated under Fed. R. Evid. 901(b)(7). *See Williams v. Long*, 585 F. Supp. 2d at 685 n.3. The letter determination also would survive a hearsay challenge, as it meets the requirements of the public records hearsay exception. *See Blasic v. Chugach Support Services, Inc.*, WDQ-04-4022, 2010 WL 3294353 (D. Md. Aug. 20, 2010) (holding EEOC letter of determination is within 803(8)(c) hearsay exemption). Therefore, Exhibit 22 is properly before this Court and may be considered in my determination of Defendant's summary judgment motion.

In summary, in considering this motion for summary judgment, all of the exhibits attached to plaintiffs' opposing memorandum are excluded, except for Exhibits 3, 6, 22, and 23.

C.  *Exhaustion*

A claimant under Title VII must exhaust his administrative remedies by raising his claim before the EEOC before pursuing a federal action. *Sloop v. Memorial Mission Hosp., Inc.*, 198 F.3d 147, 148 (4th Cir. 1999). The allegations contained in the EEOC charge operate to limit the scope of any subsequent judicial complaint. *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996). Only the claims stated in the initial charge, claims reasonably related to those stated in that charge, and those developed by reasonable investigation of that charge may be maintained in a subsequent Title VII action. *Id.* at 63. The failure by a plaintiff to exhaust administrative remedies deprives the federal courts of subject matter jurisdiction over the claim. *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).

Here, Plaintiff's original EEOC charge alleged only that he was subjected to a "hostile work environment, racial harassment and intimidation." (Pl.'s Opp'n, Ex. 6, Charge of Discrimination.) Citing the limited scope of the charge, Defendant argues that Plaintiff has

failed to exhaust administrative remedies as to his disparate treatment and retaliation claims and that those claims therefore are not properly before this court. Plaintiff argues in response that other communications between Plaintiff and the EEOC alleged discrete acts of disparate treatment and retaliation and that such acts which postdate and "grew out of" the EEOC charge are properly before this Court.

I find that Plaintiff failed to exhaust administrative remedies as to his disparate treatment claim. The original EEOC charge contains no allegations of discrete acts of disparate treatment, and Plaintiff's specific allegations of discrimination in disciplinary and promotion decisions are entirely and conspicuously absent. Instead, the charge speaks only of a hostile work environment, a claim that is "different in kind from discrete acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Martin v. Merck & Co., Inc.*, 446 F. Supp. 2d 615 (W.D. Va. 2006) (holding that although an EEOC charge alleged a racially hostile work environment, plaintiff had not exhausted remedies as to discrete acts of disparate treatment). In arguing for an expanded reading of the scope of the EEOC charge in his opposition briefing, Plaintiff relies on the original EEOC intake questionnaire, which I have already stricken as untimely filed, and his private communications with the EEOC, which I have excluded above. Moreover, an examination of the EEOC letter of determination reveals that the Commission did not investigate discrete acts of disparate treatment such as discriminatory discipline or failure to promote. (Pl.'s Opp'n, Ex. 22, Letter of Determination 1.) This is significant because the EEOC's investigation, as reflected by the letter of determination, "represents the agency's judgment on the scope of a reasonable investigation of the original charge." *Hubbard v. Rubbermaid, Inc.*, 436 F. Supp. 1184, 1190 (D. Md. 1977). Since a discrete act disparate

treatment claim was not within that scope, Plaintiff has not exhausted his administrative remedies as to that claim.[7]

However, I that Plaintiff has exhausted his administrative remedies as to his retaliation claim. As the *Hubbard* court noted, "an unsophisticated Title VII litigant should not be limited to the precise wording found in his original charge of discrimination and . . . he may litigate all claims of discrimination uncovered in a reasonable EEOC investigation of that charge." *Id.* The EEOC letter of determination stated:

> As a result of the [EEOC] investigation, evidence . . . showed that Charging Party has been subjected to harassment since the filing of his internal complaint in September 2007 and continuing after his EEOC complaint in May 2008. . . . There is . . . evidence to show ongoing retaliation due to Charging Party's engaging in "protected activity."

(Pl's Ex. 22). Since Plaintiff's retaliation claims were "developed in the course of a reasonable investigation" of his charge, included in the EEOC's reasonable cause determination, and thus included in the conciliation procedures prescribed by Title VII, plaintiff has properly exhausted his remedies as to retaliation. *See Equal Employment Opportunity Comm'n v. Gen. Elec. Co.*, 532 F.2d 359, 366 (4th Cir. 1976). Therefore, this Court lacks subject matter jurisdiction over Plaintiff's disparate treatment claims, but I will consider the retaliation claim in addition to the hostile work environment claim, which Defendant has not challenged on jurisdictional grounds.

D. *Hostile Work Environment*

To make a prima facie showing of a hostile work environment claim under Title VII, a plaintiff must show that: (1) the harassment was unwelcome, (2) the harassment was based on his race, (3) the harassment was sufficiently severe or pervasive to alter the conditions of

---

[7] Since I have determined plaintiff did not exhaust his administrative remedies as to the claims of discrete acts of disparate treatment, I need not consider Defendant's alternative argument that these claims are time barred.

employment and create an abusive atmosphere, and (4) there is some basis for imposing liability on the employer. *Causey v. Balog*, 162 F.3d 795 (4th Cir. 1998). Even assuming that the incidents cited by Plaintiff were unwelcome, based on his race, and properly imputed to Defendant, Plaintiff has not shown that the harassment was sufficiently severe or pervasive, as required by the third prong of the *Causey* test. Accordingly, Plaintiff has failed to establish an essential element of his prima facie case, and Defendant is entitled to summary judgment on the hostile work environment claim.

The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). To survive summary judgment, the conduct complained of must be "far more severe than that of 'a merely unpleasant working environment.'" *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 776 (D. Md. 2010) (quoting *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996)). Furthermore, the abusive conduct must be "sufficiently 'pervasive [so] as to become diffuse throughout every part of the . . . work environment in which plaintiff functioned.'" *Id.* (internal citations and quotations omitted). Assessing whether particular incidents of harassment were sufficiently severe or pervasive requires a district court to consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "In applying these factors, this Court has recognized that 'the standard for proving an abusive work environment is intended to be a very high one.'" *Wang v. Metro Life Ins. Co.*, 334 F. Supp. 2d 853, 864 (D. Md. 2004) (quoting *Faragher*, 524 U.S. at 788). Consequently, courts "usually only allow hostile work environment claims to proceed

where the discriminatory abuse is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance." *Tawwaab*, 729 F. Supp. 2d at 776.

A review of the case law demonstrates how the demanding nature of the hostile work environment standard. For instance, in *Martin v. Merck & Co.*, 446 F. Supp. 2d 615 (W.D. Va. 2006), employees asserted the following facts in support of their hostile work environment claim:

> (1) an unidentified white employee called Martin a "nigger"; (2) operator Sherry Dean told Tams there never would be a black female supervisor; (3) Mike Brant used the word "nigger" in front of Thomas; (4) mechanic Burford commented that blacks were not good at operating machinery; (5) Chuck Morris used the word "nigger" several times over an open walkie talkie; (6) a racially offensive cartoon was placed on Angela Hopkins door; (7) an Energizer Bunny toy was defaced to read "nigger"; (8) Robin Murkee taunted a Hispanic employee with a noose; (9) Cathy Dalrymple told Bernard Fauntleroy he needed to go back to the jungle and further mocked him because he was African-American; (10) employees Powell and Eppard taunted Tams in the locker room saying that she had an unpleasant odor because she was a black woman and also making fun of her hair, weight, and appearance; (11) Butch Wade auctioned Klu Klux Klan items simultaneously with Merck magazines; (12) Shiflett showed Thomas Klu Klux Klan material on the internet; and (13) that Reba Breeden was associated with the Ku Klux Klan.

*Id.* at 627. Yet despite the fact that plaintiffs were repeatedly exposed to the word "n****r" and confronted with racially offensive cartoons, Ku Klux Klan material, and taunting with a noose, the court held that these actions failed to rise to the level of severe or pervasive harassment that would render the workplace objectively hostile. Accordingly, the *Martin* court granted summary judgment to the defendant. *Id.* at 629; *see also Orenge v. Veneman*, 218 F. Supp. 2d 758, 761 (D. Md. 2002) (repeated racial comments such as "whites will never trust blacks again," "blacks are trying to get a free ride," and "you guys don't pull your weight" did not rise to the level of severe or pervasive).

Those few cases in which a plaintiff has succeeded in demonstrating sufficiently severe or pervasive harassment are also instructive. For instance, in *Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001), the Fourth Circuit allowed an African-American plaintiff's hostile work environment claim to proceed where his supervisor on an "almost daily basis" referred to him by slurs such as "monkey," "slave," "black b***h," and "n****r." *Id.* at 189. Similarly, in *E.E.O.C. v. Central Wholesalers, Inc.*, 573 F.3d 167 (4th Cir. 2009), the court denied a defendant's motion for summary judgment where the plaintiff's coworkers used words like "n****r" in her presence "pretty much every day," called her a "black stupid b***h," and kept "blue-colored mop-head dolls in their offices . . . hanging from nooses" around their necks. *Id.* at 175-77.

In comparison with the facts of the cases discussed above, the incidents cited by Plaintiff are insufficiently severe and pervasive to survive summary judgment. As set forth at the outset of this opinion, Plaintiff alleges seven incidents in support of his hostile work environment claim: (1) Green told plaintiff to "kiss his white ass" when Plaintiff asked him for assistance in administering medicine to a youth; (2) a youth asked Green "about African-Americans or blacks that live in Lonaconing," and Plaintiff heard Mr. Green respond, "We don't have no Hispanics or no blacks up there;" (3) Lehman, who is white, stepped between Plaintiff and Shelton, both of whom are black, and said, "Look, we got an Oreo;" (4) Lehman presented plaintiff with a bag of parsley in in the cafeteria, pretending that the bag contained marijuana; (5) during a special lunch menu planned for Black History Month, Mr. Sessea said to Plaintiff, "We're having, you know, what you like to eat, and don't get me wrong, I like it too;" (6) Mr. Harris, a white coworker, made comments suggesting that Plaintiff should "get some black girls up here;" and (7) during a

15

training exercise, Plaintiff was handcuffed and shackled to demonstrate a technique for applying restraints, and Hayslip said "all we need now is a rope and a noose."

For the most part, to the extent that these comments are based on plaintiff's race at all, they are milder than the insults and threats found in the cases discussed above. And while crude, the comments are relatively minor and infrequent in comparison to the near-daily slurs endured by the plaintiffs in *Spriggs* and *Central Wholesalers*. In fact, the harassment identified by Plaintiff here is markedly less severe than even that detailed in *Merck*, where the defendant prevailed on summary judgment. Accordingly, I conclude that most of the incidents identified by Plaintiff involve precisely the "ordinary tribulations of the workplace that are not actionable under Title VII. *Wang*, 334 F. Supp. 2d at 864.

Undoubtedy, the most troublesome of the incidents reported by Plaintiff is Hsylip's "rope and a noose" statement during training. Yet in *Merck*, a white employee "held a hangman's noose up" and asked the Hispanic plaintiff to "come over and see if it fit." 446 F. Supp. 2d at 620. By contrast, Hayslip's comment, while indisputably offensive and inappropriate, was purely verbal. Moreover, other factors mitigate the impact of Hayslip's comment on the hostility of the workplace environment. First, Plaintiff readily admits that Hayslip was immediately chastised by the training instructor. (Pl.'s Opp'n, Ex. 23, Frazier Dep. 100-02 ["A Case Management Specialist III heard him from six foot away and said something to him. . . . Something like we don't need to have that around here."].) Second, Hayslip worked in a different DJS facility and the incident occurred off-site from SMYC at Allegheny College, so there is no reason to believe Plaintiff even saw Hayslip again, let alone was harassed by him.

For the foregoing reasons, Plaintiff has failed to demonstrate that he was subject to sufficiently severe and pervasive harassment as to render his workplace objectively hostile. As

such, he has failed to make out a prima facie case under Title VII, and Defendant is entitled to summary judgment on this claim.

   *E.   Retaliation*

The Fourth Circuit in *Price v. Thompson* established that a plaintiff lacking direct evidence of retaliation may utilize the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework to prove a claim of retaliation. As the court explained:

> In the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the action. If the employer sets forth a legitimate, non-retaliatory explanation for the action, the plaintiff then must show that the employer's proffered reasons are pretextual or his claim will fail. More specifically, the plaintiff can prove pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]."

*Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).To establish a *prima facie* case of retaliation, plaintiff must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between his protected activity and the adverse action. *See Tawwaab*, 729 F. Supp. 2d at 784 (D. Md. 2010) (citing *Causey*, 162 F.3d at 803). Plaintiff fails to establish a *prima facie* case because even assuming, *arguendo*, that he were able to show that his coworkers lodged a false complaint against him for engaging in protected activity, he is unable to show that he in fact suffered an adverse employment action.

Plaintiff alleges that the OFP complaint, signed by fifteen of his coworkers, was a complete fabrication orchestrated in retaliation for his previous complaints to OFP.[8] Plaintiff

---

[8] The other acts of alleged retaliation asserted in plaintiff's complaint, such as hostile questioning, were denied in Defendant's answer, and the record is devoid of any evidence to support them. It is well established that in opposing summary judgment, plaintiff "may not rest upon the mere allegations or denials of its pleadings, but rather must set forth specific facts"

17

may have experienced stress or irritation due to his coworkers' allegedly false complaint to OFP, but he does not allege "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion—the typical requirements for a showing of an 'adverse employment action' that can support a Title VII claim." *Boone v. Goldin*, 178 F.3d 253, 255-56 (4th Cir. 1999) (citing *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (adverse employment actions have consistently focused on ultimate decisions such as hiring, granting leave, discharging, promoting, and compensation)). Indeed, as Plaintiff admits, the OFP took neither took nor recommended any action at all as a result of his coworkers' complaint. Under these circumstances, Plaintiff has failed to allege that he suffered any sort of adverse employment action. Again, because Plaintiff has failed to carry his burden of proof on one of the essential elements of his prima facie case, summary judgment is properly entered in favor of Defendant.

III. CONCLUSION

Because plaintiff has failed to demonstrate the existence of any genuine issue of material fact, and because defendant is entitled to judgment as a matter of law, defendant's motion for summary judgment is granted.

Date: November 14, 2011

J. Frederick Motz
United States District Judge

showing there is a genuine dispute about a material fact for trial. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003).